## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

SUSAN J. DEERING,

        Plaintiff,

        v.                          Case No. 3:05cv210/RV/MD

MARCO DESTIN, INC. d/b/a
ALVIN'S STORES, INC. d/b/a
ALVIN'S ISLAND TROPICAL
DEPARTMENT STORES,

        Defendant.

_____/

### ORDER

This employment case arises under Title VII of the Civil Rights Act of 1964 [42 U.S.C. § 2000e, *et seq.*] ("Title VII"), the Florida Civil Rights Act [Fla. Stat. § 760.01, *et seq.*] (the "FCRA"), and state common law. Plaintiff is seeking damages for claims of gender discrimination, retaliation, and unpaid wages. The parties have completed discovery, and Defendant now moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure (doc. 23).

I.    **BACKGROUND**

    **A. Facts**

Unless otherwise noted, the following facts appear to be undisputed.

In or about March 1994, Plaintiff Susan J. Deering began working at Alvin's Island Tropical Department Store ("Alvin's") on Pensacola Beach. Alvin's is part of a chain of retail beach-oriented souvenir stores located along the Gulf Coast. Throughout her employment, Alvin's utilized the following management structure and hierarchy: there was a district manager, a store manager, an assistant manager, supervisors, and floor employees. Plaintiff was hired as a floor employee.

Three years into her employment, in 1997, she was promoted to supervisor and given keys to the store. Plaintiff was at all times an hourly, unsalaried employee.

During this general time period, Alvin's was segregated into two parts --- the lower level, and the upper level. The lover level was known as the "gift floor," and it was where the souvenir-type collectibles were located. The upper level consisted of clothing and accessories, such as swimwear, sportswear, children's clothing, hats, and shoes. As supervisor, Plaintiff was mostly responsible for supervising the lower level. She trained cashiers and other floor employees; she made sure that the cashiers had the supplies to operate their registers; she created the "duty sheets" (which means that she assigned the floor employees to their sections in the store and scheduled them for breaks); she was in charge of making fudge that was sold to the customers; and she worked on shelf and window displays.[1]

Plaintiff was particularly adept at her register-related duties. She wrote the training manuals for the cashiers, she utilized her own program to train new cashiers, and she would frequently "jump on" a register to help when cashiers were backed-up and customer lines started to form. Plaintiff was complimented about her abilities as a cashier by being able to "kill a line faster than anybody else."

Plaintiff worked under the same management and had the same general duties, as outlined above, until January 2004. At that time, Alvin's was taken over by another company, Defendant Marco Destin, Inc. ("Marco"). Marco owned a string of beach-oriented stores called Wings, and it had its own, very different style of doing business. Marco told the employees that changes were going to be made at the store because "we've got a way of doing business, and that's the way we're going to run this store, too." The store was completely reconfigured under the new

---

[1]

Plaintiff was not the only supervisor at the store during this period. There were four supervisors in total, and it appears that they shared joint (if not equal) responsibility for these general tasks. For example, Plaintiff testified that one of the other supervisors would fill out the duty sheets when she was off.

ownership. For example, the merchandise was taken out and rearranged, the display racks were rebuilt, the gift floor was scaled back, and the clothing section was enlarged.

The store not only underwent a physical transformation, but there were significant management and personnel changes as well. Marco utilized its own managerial hierarchy and nomenclature, which was considerably less formal than the prior one. Instead of having a clearly defined store manager, assistant manager, and several supervisors, Marco had one store manager, an assistant manager, and then an undefined group of "helpers" or "kind of watching-over assistant managers." Marco did not use the term supervisor as it had been used under the prior ownership. For Marco, there was only one supervisor: the area supervisor, or district manager.

The former Alvin's managerial employees did not welcome these changes. Neither the district manager, nor the store manager, nor the assistant manager stayed more than several weeks after Marco took over. Two of the four supervisors under the old ownership left within weeks because they did not like, and were not open to, the changes being made. And within a few months thereafter, the third supervisor also left. Marco brought in replacement management from its other stores during this general transitional period.

Notwithstanding the several different changes at Alvin's described above, there were two changes in particular that directly affected Plaintiff and ultimately form the basis of this lawsuit.

(i) *Change in vacation pay policy*

After the change in ownership, the Vice President and Chief Financial Officer of Marco, Dror Levy, issued a series of memoranda addressing what the employees could expect in regards to their job duties, responsibilities, and assignments with the new owners. One specific memorandum was addressed to salaried employees (as distinguished from hourly employees, like Plaintiff), and it advised that their

vacation time "will be the same as with the previous owner." Plaintiff has testified that there was a separate memorandum that addressed vacation time for non-salaried employees. This memorandum, which was lost and has not been found, provided that vacation time would be available for all employees as it had been under the old management. Under the old management system, employees who worked at Alvin's for ten years were eligible for three weeks paid vacation leave annually.

In early 2004, Plaintiff was approaching her ten-year anniversary, and she wanted to take her full three-weeks vacation to attend the birth of her grandchild. To confirm that she was, indeed, going to receive vacation pay consistent with Alvin's previous policy, Plaintiff called the Marco business office in Panama City. She was told that she would need to get permission from Yair Alon, the new area supervisor/district manager. In February, one month before her anniversary, Plaintiff asked Mr. Alon if she could take vacation. After conferring briefly with the new store manager, Tal Shaul, Mr. Alon said "of course you can go." Plaintiff did not mention anything about (or ask) if the vacation would be paid. Rather, she just assumed that it would be paid since she had received the memoranda indicating that all employee vacations were to be handled the same way as they had been under the old management.[2]

Plaintiff took her vacation from March 22 through April 12, 2004. She was later told (several weeks after she returned to work) that she would not be paid vacation pay. Mr. Levy has stated via affidavit that Plaintiff --- as an hourly employee --- was not eligible for paid vacation under the new Marco policy, even though she would have been eligible under the old ownership.

---

[2]

It appears to be undisputed that Plaintiff never asked Mr. Alon or Mr. Shaul if her vacation was going to be paid. However, Mr. Shaul testified during deposition that he recalled Plaintiff saying to him that she "was deserving a [paid] vacation, like in the old times."

(ii) *Change in Plaintiff's job duties post-vacation*

Shortly after she returned from her vacation, although it is not clear in the record exactly when, Mr. Shaul told Plaintiff that she was no longer going to create the duty sheets and schedule the employees. When she asked why, Mr. Shaul told her that "women couldn't assign jobs" because they "didn't know how." So, he decided to assign the duties and schedules himself.[3]

On April 22, 2004, Mr. Shaul told Plaintiff that women were weak and that they should not laugh, giggle, or talk about work; rather, "girls were to look at." The following day, Plaintiff again asked why she was not allowed to continue doing her normal duties. Mr. Shaul responded, Plaintiff says,  that "no one respects women or listens to women. Women should sweep floors and run cash registers."

Approximately three weeks after she returned from vacation, in May 2004, Plaintiff had still not received her vacation pay (and had not been told that she would not get it). She asked Mr. Shaul why she had not been paid, and he told her to speak with Mr. Alon about the issue, which she did. Mr. Alon told her she did not deserve to have vacation.  He then turned his back on her, and told her that he "didn't have to answer women." Thereafter, on May 21, 2004, Mr. Shaul took Plaintiff's office key away from her.

A few days later, on May 26, 2004, Mr. Shaul called Plaintiff into his office, where he was waiting with Oren, the assistant manager. Mr. Shaul told her that she could no longer help unload the delivery trucks because women were not strong enough to work stock. He again stated that women were "weak" and that Plaintiff should yell at the employees so that they would respect and listen to her. He told her that women could not be supervisors, that a man with a foreign accent

---

[3]

I note that there is some uncertainty in the record as to exactly when this exchange --- and the other exchanges, discussed *infra* --- took place. Resolving all ambiguities and doubts in Plaintiff's favor, I will assume for purposes of this order that these events took place as set forth in her answers to interrogatories, which were filed in opposition to Defendant's motion for summary judgment.

could yell and get more respect than a woman, and that she would from that point forward have to stay in the front of the store and be the "main cashier."

It is undisputed that Plaintiff did not suffer a decrease in pay, hours, or benefits as a result of the above changes to her job description. Plaintiff contends, however, that she was demoted to the position of cashier, that her authority was undermined, that she was humiliated, and that she was "completely stripped" of all supervisory authority.[4]

Plaintiff sent a letter via e-mail to the United States Department of Labor a few days after her May 26th meeting with Mr. Shaul. In that letter, dated May 30, 2004, Plaintiff complained that she had been denied her rightful vacation pay. She described the meeting with Mr. Shaul and recounted his gender-based comments. The Department of Labor told Plaintiff to file a claim of discrimination with the Equal Employment Opportunity Commission ("EEOC").

Around this time, Plaintiff's attitude at work began to change. Although she was still a good employee and did her job well, she concedes that she was not as "polite" and "friendly" as she had been before. Plaintiff admits that she talked to other employees about her not being paid for vacation, and she complained to them about the store not being as organized and well-managed as it had been under the old management. In addition to being generally upset with the new management, Plaintiff was still very upset about being denied vacation pay. On June 8, 2004,

---

[4]

During her deposition, Plaintiff described three other examples of alleged gender discrimination. First, she recounted an instance where Mr. Shaul showed up late for work one morning and there were two young female employees waiting on the porch for him to open the store. When he arrived, the two girls were laughing and giggling about something. Because he "didn't like girls to giggle," he fired them on the spot. Second, Mr. Shaul told Plaintiff's husband when he called the store one day that "women don't tell the truth." And third, Mr. Shaul told an employee, who told another employee, who in turn told Plaintiff, that "a crack whore" could do Plaintiff's job.  For purposes of the pending motion, these statements relayed via other persons are treated as hearsay, and shall not be considered.

she retained a lawyer. Two days later, on June 10th, her attorney wrote a demand letter to Mr. Levy, advising that if Plaintiff did not receive her unpaid wages immediately, then she would consider suing the company for her vacation pay and seek attorney fees. At this point, Plaintiff felt that her work environment became "very hostile." She admits that the hostility may have been related to the letter from her attorney to Mr. Levy. In fact, Plaintiff was worried that she might be fired for the letter. Her concern was well-founded. Mr. Levy made the decision to, and did, have Plaintiff terminated on June 21, 2004, eleven days after her attorney sent the letter.

**B. Administrative and Procedural History**

On June 8, 2004, the same day that she first went to see her attorney, Plaintiff filed a complaint with the Escambia-Pensacola Human Relations Commission ("EPHRC"). She complained that she was being discriminated against on the basis of gender. Plaintiff reported that she was told she could not do her job because she was a woman and that a man with a foreign accent could do it better. She stated that she had her authority removed, and this was degrading to her.

On June 26, 2004, five days after her termination, Plaintiff returned to the EPHRC and filed a second complaint. She alleged in her second complaint that she had been retaliated against and wrongfully discharged for filing the earlier EPHRC complaint of gender discrimination. Plaintiff was made aware at that time (and she has testified that she fully understood) that filing with the EPHRC was not the same thing as filing with the EEOC and/or the Florida Commission on Human Relations ("FCHR"). Accordingly, she requested that her complaint be forwarded to the proper reporting agency, which it was. Thereafter, on July 7, 2004, the EEOC sent her a letter and a charge of discrimination that was prepared on her behalf.

The EEOC charge contained a series of boxes and Plaintiff was asked which one(s) applied to her complaint. The box designated "sex" discrimination was checked. One of the other available boxes applied to "retaliation," but that box was

left unchecked.[5] The charge form was filed and sent to Defendant on July 15, 2004; this charge was "ignored and unanswered." The EEOC then proceeded to conduct its investigation into the allegations. Several months later, on January 18, 2005, the agency issued its final determination and concluded that there was reasonable cause to believe that Plaintiff had been discriminated against when her job duties were changed.

Plaintiff filed a five-count complaint in this case on June 7, 2005. She alleges gender discrimination under Title VII and the FCRA (counts I, III) and retaliation under Title VII and the FCRA (counts II, IV). She also advances a state-law claim for the unpaid vacation wages (count V). Defendant now moves for summary judgement as to each claim.

## II.   SUMMARY JUDGMENT STANDARD

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corporation v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); see also, e.g., Morisky v. Broward County, 80 F.3d 445, 447 (11th Cir. 1996).

---

[5] I note that Plaintiff reviewed the EEOC charge during her deposition, and she answered "yes" when asked if the retaliation box was checked. This was presumably a typographical error by the court reporter as that box was clearly left unchecked. Furthermore, the subsequent questions that defense counsel posed during this part of her deposition (and the answers Plaintiff gave) indicate that she had said "no," the retaliation box had not been checked.

However, summary judgment will be inappropriate "if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 594 (11th Cir. 1995). An issue of fact will be "material" if it might affect the outcome of the case under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). It is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. Id.; see also Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

Conclusory allegations based on subjective beliefs are insufficient to create a genuine issue of material fact. Leigh v. Warner Bros., Inc., 212 F.3d 1210, 1217 (11th Cir. 2000); see also Ramsey v. Leath, 706 F.2d 1166, 1170 (11th Cir. 1983). But, on a summary judgment motion, the record evidence and all reasonable inferences drawn therefrom must be viewed in a light most favorable to the non-moving party. National Fire Ins. Co. of Hartford v. Fortune Const. Co., 320 F.3d 1260, 1267 (11th Cir. 2003); Whatley v. CNA Ins. Cos., 189 F.3d 1310, 1313 (11th Cir. 1999).

### III.   DISCUSSION

#### A. Gender Discrimination (Counts I and III)

Although Plaintiff's gender discrimination claims are presented as two separate counts under Title VII and the FCRA, the substantive law that applies to both counts is the same. Castleberry v. Edward M. Chadbourne, Inc., 810 So.2d 1028, 1030 n.3 (Fla. 1st DCA 2002) (explaining that federal case law dealing with Title VII is applicable in construing the FCRA, which is patterned after Title VII) (citing cases); accord Scott v. Florida Dep't of Children & Family Services, 2005 WL 2175179, at *4 (N.D. Fla. Sept. 6, 2005) (same). Consequently, counts I and III will either stand or fall together.

The parties agree that the now-familiar <u>McDonnell Douglas</u> burden shifting framework applies to this case. <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). Under this analysis, for Plaintiff to prove gender discrimination, she must first establish a *prima facie* case by showing the following four things: (i) that she was a member of a protected class; (ii) that she was qualified for the job; (iii) that she suffered an adverse employment action; and (iv) that she was replaced by someone outside her protected class. <u>Hinson v. Clinch County, Georgia Bd. of Educ.</u>, 231 F.3d 821, 828 (11th Cir. 2000) (citing cases). "Demonstrating a *prima facie* case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." <u>Holifield v. Reno</u>, 115 F.3d 1555, 1562 (11th Cir. 1997). If Plaintiff establishes her *prima facie* case, thereby raising an inference of discrimination, then the burden shifts to Defendant to rebut the inference by presenting legitimate, non-discriminatory reasons for the employment action. <u>Id.</u> at 1564. This intermediate burden is "exceedingly light," <u>id.</u>, and once it has been satisfied Plaintiff must show that the articulated reason was a pretext for discrimination. <u>See</u> <u>Chapman</u>, *supra*, 229 F.3d at 1024.

Defendant advances two main arguments in support of summary judgment on the gender discrimination counts. First, Defendant contends that Plaintiff cannot establish a *prima facie* case because she did not suffer an adverse job action as a matter of law. Next, assuming that Plaintiff can establish her *prima facie* case, Defendant contends that it has identified legitimate and non-pretextual reasons for the employment actions it took. Each will be discussed in turn.

(i) *Did Plaintiff suffer an adverse job action?*

"[I]t is clear that to support a claim under Title VII's anti-discrimination clause the employer's action must impact the 'terms, conditions, or privileges' of the plaintiff's job in a real and demonstrable way." <u>Davis v. Town of Lake Park, Fla.</u>, 245 F.3d 1232, 1239 (11th Cir. 2001) (*quoting* 42 U.S.C. § 2000e-2(a)); <u>accord</u> <u>Brown v. Sybase, Inc.</u>, 287 F. Supp. 2d 1330, 1339-40 (S.D. Fla. 2003). The

asserted impact "cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment." Davis, *supra*, 245 F.3d at 1239. Therefore, "to prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a *serious* and *material* change in the terms, conditions, or privileges of employment." Id. (emphasis in original). Title VII does not "extend to 'everything that makes an employee unhappy,'" see id. at 1242, and the employee's personal view of the significance and adversity of the job action is not controlling; rather, the action must be materially adverse as viewed objectively by a reasonable person under the circumstances. Id. at 1239.

Defendant argues that Plaintiff did not sustain an adverse job action when her job duties were changed (that is, when her supervisory authority was taken from her and she was reduced to being the main cashier). By making this argument, Defendant necessarily assumes that the only employment action related to the gender discrimination claim is the alleged demotion. That is not so, although the record is admittedly unclear on this issue.

In the complaint filed in this lawsuit, Plaintiff alleged that she "was illegally terminated . . . on the basis of her gender." Plaintiff later expressed the view during her deposition that she was *not* fired for being female. Rather, she claimed at that time that she was demoted because she was female, but she was fired in retaliation for her EPHRC complaint. In her amended response to Defendant's motion for summary judgment, however, Plaintiff again indicated that she was subjected to an adverse job action "when she was demoted to the position of cashier *and terminated*."  I must draw all inferences in her favor.  Accordingly, I find that the Plaintiff claims in this lawsuit that her demotion and termination was based on gender discrimination.  Plaintiff has stated a *prima facie* case.

(ii) *Is Defendant's proffered reason a pretext?*

Once Plaintiff establishes her *prima facie* case the burden shifts to Defendant to explain why it took the action that it did. Once this "exceedingly light" burden is

met, Plaintiff must prove pretext.

Here, Defendant claims that Plaintiff was demoted as part of the reorganization effort, and that she was fired because of her attitude. This could possibly be true. However, given the facts established by the evidence in the record, a jury may well conclude that this stated reason was merely a pretext to hide discrimination.  There are genuine issues of material fact present, precluding summary judgment.

**B. Retaliation (Counts II and IV)**

As with the gender discrimination claims, the retaliation counts under Title VII and the FCRA are governed by the same legal principles. Thus, to establish her *prima facie* case for retaliation under Title VII and the FCRA, Plaintiff must show (i) that she engaged in statutorily protected expression; (ii) that she suffered an adverse job action; and (iii) that there is some causal connection between the two events. Meeks v. Computer Associates, Int'l, 15 F.3d 1013, 1021 (11th Cir. 1994).

Here, it is undisputed by the parties that Plaintiff engaged in protected activity by filing a complaint of discrimination with the EPHRC, and she suffered an adverse job action when she was fired. The only questions to be resolved, therefore, are whether there is a causal relationship between the two incidents and, if so, whether Defendant has stated a non-pretextual reason for her termination.[6]

Taking the record evidence in the light most favorable to Plaintiff, summary judgment is simply inappropriate on the retaliation claims. A reasonable jury could

---

[6]

Defendant also argues that Plaintiff did not exhaust her retaliation claim with the EEOC. Even though the retaliation box was left unchecked, binding precedent makes clear that "the failure to place a check mark in the correct box is [not] a fatal error" because "no one --- not even the unschooled --- should be boxed out." Sanchez v. Standard Brands, Inc., 431 F.2d 455, 463 (5th Cir. 1970)*.*  The record plainly indicates that the Plaintiff conveyed her belief that the defendant had acted in retaliation when she met with the EPHRC and requested that discrimination charges be filed.

find on this record that Defendant not only knew of Plaintiff's gender discrimination complaint, but that there was a direct causal relationship between that complaint and her termination. Relatedly, a reasonable jury could also find that the defendant's proffered reason for her termination was a mere pretext.

### C. Unpaid Vacation Wages (Count V)

Little needs to be said about this cause of action. Plaintiff has testified that Defendant issued a memorandum indicating that all Alvin's employees were to receive vacation pay consistent with the old management policy. She also testified that she requested assistance in this regard from the Marco business office, and she was told that she only needed to get permission from the store manager, which she did. Plaintiff claims, and a reasonable jury could find on this evidence, that she was entitled to vacation pay and/or she reasonably relied to her detriment upon these representations. Accordingly, summary judgment is inappropriate.

## IV.   CONCLUSION

For the above-stated reasons, Defendant's motion for summary judgment (doc. 23) is DENIED.

DONE and ORDERED this 5th day of March, 2007.


/s/ *Roger Vinson*
**ROGER VINSON**
**Senior United States District Judge**